UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| A. B., by and through his next friends, JAMIE B. and NICOLE B., § § § Plaintiff, § VS. § CLEAR CREEK INDEPENDENT SCHOOL § DISTRICT, § § § Defendant. | CIVIL ACTION NO. 4:17-CV-2382 |

## MEMORANDUM OPINION AND ORDER

### I. INTRODUCTION

Pending before the Court is the defendant's, Clear Creek Independent School District ("CCISD"), motion for summary judgment. (Dkt. No. 11). The plaintiff, A.B., by and through his next friends, Jamie B. and Nicole B. ("A.B.", "A.B.'s parents" or the "plaintiff"), has filed a response in opposition to the motion (Dkt. No. 14). CCISD's motion for summary judgment stems from a dispute between A.B.'s parents and CCISD over a Texas Education Agency ("TEA") special education hearing officer's decision in *A.B. b/n/f J.B. and N.B. v. Clear Creek Independent School District*, Docket No. 179-SE-0317. After having carefully considered the motion, response, the administrative record, and applicable law, the Court determines that CCISD's motion for summary judgment should be **DENIED**.

### II. FACTUAL OVERVIEW

This civil action, brought pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1415(i)(2)(A), concerns A.B., a ten-year-old, third grade student who qualifies to receive special education and related services under the eligibility categories of

Autism, Intellectual Disability (ID) and Speech Impairment. A.B. lives with his parents in the geographical area served by CCISD and attends a CCISD elementary school. On March 31, 2017, A.B.'s parents filed a complaint against CCISD, requesting an impartial due process hearing, alleging that: (1) during the 2015-2016 and 2016-2017 school years, CCISD failed to provide A.B. with a free, appropriate public education (FAPE) within the meaning of the IDEA; (2) CCISD's proposed placement of A.B. into a Learning to Learn class from his current placement in a general education class with in-class and resource room support failed to place A.B. in the least restrictive environment reasonably calculated to provide him with the requisite educational benefit within the meaning of the IDEA; and (3) CCISD failed to conduct an Assistive Technology (AT) evaluation during the 2016 – 2017 school year.

Following an evidentiary due process hearing held on May 22 - 23, 2017, the administrative hearing officer issued a decision on July 7, 2017, finding, in relevant part, as follows:

- CCISD's 2016 Full Individual Evaluation (FIE)[1] of A.B., including its Intellectual Disability (ID) determination was conducted in accordance with the IDEA and was appropriate;

- CCISD provided A.B. with a free appropriate public education (FAPE) during the 2015-2016 and 2016-2017 school years; and

- CCISD's proposed placement of A.B. in a self-contained, special education classroom for core academics, including English language arts (ELA), math, science and social studies, for the 2017-2018 school year is not and cannot be reasonably calculated to provide A.B. with the requisite educational benefit in the least restrictive environment (LRE) under the IDEA.

---

[1] A FIE is a comprehensive evaluation that uses a variety of tools and strategies to assess relevant functional, developmental and academic information about a particular child. 34 C.F.R. § 300.304(b). The information may be used in determining whether the child is a child with a disability and the appropriateness of content to be included in a disabled child's written statement of educational services, including information related to the child's overall assessment and factors for progress in the general education curriculum. *Id*.

Consequently, the hearing officer ordered CCISD to maintain A.B.'s placement in the general education classroom for the 2017-2018 school year with in-class and resource room support.

On August 4, 2017, A.B.'s parents filed the instant action seeking a determination that A.B. is a prevailing party entitled to recover attorney's fees and costs based on the hearing officer's finding that CCISD's proposed placement did not meet the least restrictive requirements of the IDEA. CCISD filed an answer that contained a counterclaim seeking to challenge the hearing officer's placement decision as erroneous. It further denies that the plaintiff is a prevailing party entitled to recover attorney's fees and costs, given that the hearing officer made only one finding in the plaintiff's favor.[2]

CCISD now moves for a summary judgment on its counterclaim, seeking an order from this Court reversing and vacating the hearing officer's decision with regard to its finding that CCISD's proposed placement of A.B. did not meet the least restrictive requirements of the IDEA.

### III.  STANDARD OF REVIEW

Under the IDEA, "[a]ny party aggrieved by the findings and decision" of an administrative hearing officer may bring suit in district court. 20 U.S.C. § 1415(i)(2)(A). "When a district court reviews a hearing officer's decision under the IDEA program, it receives the records of the administrative proceedings and also takes additional evidence at the request of any party." *Houston Indep. Sch. Dist. v. V.P. ex rel. Juan P.*, 582 F.3d 576, 582 - 83 (5th Cir. 2009); *see also*. "When no new evidence is presented to the district court in an IDEA suit . . . 'the motion for summary judgment is simply the procedural vehicle for asking the judge to decide the case on the basis of the administrative record.'" *Loch v. Edwardsville Sch. Dist. No. 7*, 327 Fed. App'x. 647, 650 (7th Cir. 2009) (quotation omitted); *see also Austin Indep. Sch. Dist.*

---

[2] The attorney's fee issue will be resolved pursuant to a separate order to be issued by the Court.

*v. Robert M.*, 168 F. Supp. 2d 635, 638 (W.D. Tex. 2001), *aff'd sub nom. Austin Indep. Sch. Dist. v. Robert M*, 54 F. App'x 413 (5th Cir. 2002).

"In a case arising under the IDEA, '[a]lthough the district court must accord 'due weight' to the hearing officer's findings, the court must ultimately reach an independent decision based on a preponderance of the evidence.'" *Rockwall Indep. Sch. Dist. v. M.C.*, 816 F.3d 329, 338 (5th Cir. 2016) (citing *Cypress–Fairbanks Indep. Sch. Dist. v. Michael F.*, 118 F.3d 245, 252 (5th Cir. 1997)). As such, courts are to perform a "virtually *de novo*" review. *Id.* The role of the courts under the IDEA, however, is not without bounds. *See Flour Bluff Indep. Sch. Dist. v. Katherine M.*, 91 F.3d 689, 693 (5th Cir. 1996). The court's task is not to second-guess the decisions of school officials or to impose its own plans for the education of disabled students, but rather is restricted to determining whether those school officials have complied with the IDEA. *Id.* In this case, the parties have not submitted any new evidence, so this Court's examination of the hearing officer's decision will be based on the administrative record below.

"The Fifth Circuit has held that there is a presumption in favor of the educational placement established by a student's [Individualized Education Plan (IEP)], and the party attacking its terms should bear the burden of showing why the educational setting established by the IEP is not appropriate." *Christopher M. v. Corpus Christi Indep. Sch. Dist.*, 933 F.2d 1285, 1291 (5th Cir. 1991).

## IV. ANALYSIS & DISCUSSION

### A. IDEA's Statutory Framework

"Congress enacted the IDEA to ensure that children with disabilities will have access to public education, including special education and related services." *R.H. v. Plano Indep. Sch. Dist.*, 607 F.3d 1003, 1008 (5th Cir. 2010) (citing *Daniel R.R. v. State Bd. of Educ.*, 874 F.2d

1036, 1044 (5th Cir. 1989)); *see also* 20 U.S.C. § 1400(d)(1)(A). "The IDEA requires school districts in states receiving designated federal funds to implement procedures and policies that assure that each disabled student receives a 'free appropriate public education,' or 'FAPE.'" *R.H.*, 607 F.3d at 1008 (citing 20 U.S.C. §§ 1412(a)(1), 1415(a)). "To ensure that a child receives a FAPE, parents and school districts collaborate to develop an [IEP] that is 'reasonably calculated to enable the child to receive educational benefits.'" *Id.* (citations omitted).

"The IDEA mandates that disabled children be educated among non-disabled children, to the fullest extent possible, in the least restrictive environment." *Richardson Indep. Sch. Dist. v. Michael Z.*, 580 F.3d 286, 292 (5th Cir. 2009) (internal citations omitted). It does not, however, entitle a disabled child to a program that maximizes his potential, but rather "guarantees a 'basic floor' of opportunity 'specifically designed to meet the child's unique needs, supported by services that will permit him to benefit from the instruction.'" *Id.* (internal citations omitted). The educational benefit, nevertheless, "cannot be a mere modicum or *de minimis*; rather, an IEP must be likely to produce progress, not regression or trivial educational advancement." *Id.* (citation omitted).

An IEP is an individualized, written statement that "sets out the disabled child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives." *Honig v. Doe*, 484 U.S. 305, 311 - 12, 108 S. Ct. 592, 98 L. Ed.2d 686 (1987) (citing § 1401(19); *see also* § 20 U.S.C. 1414 (d)(1)(A)(i)). "IEPs are created and periodically reviewed following meetings at which parents, teachers, other school personnel, and educational experts all participate." *Klein Indep. Sch. Dist. v. Hovem*, 690 F.3d 390, 395

(5th Cir. 2012) (citing 20 U.S.C. § 1414(d)(1)(B)). "Once school officials and parents agree on the IEP, the school district must put it into effect." *Id.*, citing 20 U.S.C. § 1414(d)(2)(A).

"In Texas, the persons charged with preparing an IEP are known collectively as an Admissions, Review and Dismissal Committee ('ARD Committee')." *Cypress-Fairbanks Indep. Sch. Dist. v. Michael F. by Barry F.*, 118 F.3d 245, 247 (5th Cir. 1997). The ARD Committee consists of "the parents of the child with a disability, at least one of the child's regular education teachers, at least one special education teacher, a qualified representative of the school district (the local educational agency), an individual who can interpret 'the instructional implications of evaluation results,' other individuals who have knowledge or special expertise regarding the child (included at the discretion of the parent or agency), and, when appropriate, the child with a disability." *Juan P.*, 582 F.3d at 602 n.1 (citing 20 U.S.C. § 1414(d)(1)(B)) (other citations omitted).

A party is entitled to file a complaint under the IDEA "with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child." 20 U.S.C. § 1415(b)(6)(A). Any party presenting a complaint under the aforementioned provision can request an impartial due process hearing. *See* 20 U.S.C. § 1415(f)(1)(A). An aggrieved party may, thereafter, initiate a civil action. *See* 20 U.S.C. § 1415(i)(2)(A).

The Fifth Circuit has delineated four factors courts should consider as "indicators of whether an IEP is reasonably calculated to provide a meaningful educational benefit under the IDEA": "(1) [whether] the program is individualized on the basis of the student's assessment and performance; (2) [whether] the program is administered in the least restrictive environment; (3) [whether] the services are provided in a coordinated and collaborative manner by the key

'stakeholders'; and (4) [whether] positive academic and non-academic benefits are demonstrated." *Juan P.*, 582 F.3d at 584 (citing *Michael F.*, 118 F.3d at 253.). "[T]hese factors are . . . intended to guide a district court in the fact-intensive inquiry of evaluating whether an IEP provided an educational benefit," and the court does not err in affording more or less weight to one than the other. *Michael Z.*, 580 F.3d at 294. Only the second and fourth factors are at issue in this case.

### B. Whether CCISD's Proposed Placement Constitutes the Least Restrictive Environment

Pursuant to the IDEA, a student must be educated in the "least restrictive environment" appropriate to meet his needs. 20 U.S.C. § 1412(a)(5)(A). To this end, the IDEA expresses a strong preference for "mainstreaming." *Id.* More specifically, the IDEA mandates the following:

> To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in the regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

*Id.* The Fifth Circuit has defined the "least restrictive environment" as "'not only freedom from restraint, but the freedom of the child to associate with his or her family and able-bodied peers' to the maximum extent possible." *Teague Indep. Sch. Dist. v. Todd L.*, 999 F.2d 127, 128 n.2 (5th Cir. 1993) (quoting *Sherri A.D. v. Kirby*, 975 F.2d 193, 207 n. 23 (5th Cir. 1992)). In *Daniel R.R.*, 874 F.2d at 1048, the Circuit articulated the following flexible, two-part test for determining whether an IEP's placement of a disabled child is in the least restrictive environment:

> First, we ask whether education in the regular classroom, with the use of supplemental aids and services can be achieved satisfactorily for a given child. *See* § 1421(a)(5)(B). If it cannot and the school intends to provide special education or to remove the child from regular education, we ask, second, whether the school has mainstreamed the child to the maximum extent appropriate.

*Id.*

In resolving the two questions mentioned above, the Fifth Circuit has suggested that district courts consider several factors including: "whether the state has taken steps to accommodate the handicapped child in regular education"; "whether the child will receive an educational benefit from regular education"; "the child's overall educational experience in the mainstreamed environment, balancing the benefits of regular and special education for each individual child"; and "what effect the handicapped child's presence has on the regular classroom environment and, thus, on the education that the other students are receiving." *Id.* at 1048 - 49. No single factor in this non-exhaustive list is dispositive. *Id.* at 1048. A court's analysis must consist of "an individualized, fact-specific inquiry that requires [it] to examine carefully the nature and severity of the child's handicapping condition, his needs and abilities, and the schools' response to the child's needs." *Id.*

The record now before the Court supports the hearing officer's conclusion that CCISD failed to provide A.B. with an education in the least restrictive environment (LRE), in compliance with the IDEA. There is no dispute that A.B. exhibited the most progress during the 2016–2017 academic year, within a general education classroom with in-class and resource room support. Despite CCISD's claims to the contrary, there is no overwhelming evidence in the record establishing that A.B. is so limited in function, or so demanding as a student, as to entirely absorb a teacher's time and create an undue burden, especially with a paraprofessional providing in-class and resource room support. *See Daniel R.R.*, 874 F.2d at 1046 n.6. Also, in light of

A.B.'s improved behavior, he is no longer disruptive in a disciplinary sense and has shown marked improvement such that he no longer exhibits task avoidance behaviors.

CCISD maintains that A.B. cannot be satisfactorily educated in a general education setting for core academics because he is unable to grasp any of the classroom instruction and that placement of him in a Learning to Learn classroom will not only afford him access to the entire curriculum at the level and pace that he requires, but will also afford him time with his non-disabled peers during art, music, physical education classes, recess and lunch. A special education teacher teaching the Learning to Learn class, however, reported that the students in the current Learning to Learn class exhibit severe behavioral issues, notably those very issues with which A.B. has made remarkable progress.[3] She noted that given A.B.'s significant improvement in these areas, exposing him to constant behaviors such as shrieking and throwing desks and chairs would not result in any non-academic benefit. It was also noted that removing A.B. from all core academic classes would deprive him of the opportunity to "model his peers" or mimic their positive behaviors and likely cause him to regress. Further, A.B.'s placement in the Learning to Learn class would require him to be relocated to yet another elementary school within the district.

Indeed, A.B.'s evaluators reported that his behaviors were at a low frequency and low intensity, in that he independently transitioned to the restroom and his general education classroom, exhibited a willingness to follow directions provided by the large-group instructor, and displayed initiative to complete tasks. The record also indicates that A.B. demonstrated meaningful educational progress (passing grades and making substantial progress towards IEP goals) in a mainstream classroom. In fact, A.B. received positive, nontrivial, academic and

---

[3] A.B.'s parents maintain that A.B.'s prior placement in the Learning to Learn classroom, while in first grade during the 2014-2015 school year, caused him to pick-up problematic behavior from others in the room and negatively impacted his overall development.

nonacademic benefits when placed in a classroom in a general education setting. His progress reports, for instance, demonstrate that, even as of December 16, 2016, before he began any dramatic behavioral improvement, A.B. was making progress towards his goals and objectives. (AR 1208-9). In fact, in some instances, A.B. had made even more progress by December 16, 2016--the 18th week mark--than he had been projected to make by the 27th-week mark. *See, e.g.,* (AR at 1209) (documenting A.B.'s Social Studies goal at 62%, where the 27th week progress projection was 60%). In other instances, A.B. was relatively close to the 27th-week projections by the 18th-week mark. *See, e.g.,* (AR 1209) (documenting A.B.'s Math goal at 54%, where the 27th-week progress projection was 60%, and documenting his Science goal at 57%, where the 27th- week progress projection was 60%). It is further undisputed that A.B. had mastered most of his IEP goals, progressed in math, and made great strides in writing. Indeed, it is not necessary for a student to improve in every area to obtain an educational benefit from his proposed IEP. *See Houston Indep. Sch. Dist. v. Bobby R.*, 200 F.3d 341, 350 (5th Cir. 2000).

Although A.B.'s test scores and evaluations showed academic performance below his assigned grade level, with instruction at a slower pace and with more repetition, his progress remained consistent and markedly improved in a general educational setting. Under the IDEA, a child's progress and development "is measured with respect to [his] individual progress, not [his] abilities in relation to the rest of the class." *Juan P.*, 582 F.3d at 586; *see also Bobby R.*, 200 F.3d at 349.

Further, A.B.'s teachers and counselors noted that he had made progress on his behavior and social skills goals, such as modeling the behaviors of non-disabled students. *See Daniel R.R.*, 874 F.2d at 1049 ("For example, a child may be able to absorb only a minimal amount of the regular education program, but may benefit enormously from the language models that his

nonhandicapped peers provide for him. In such a case, the benefit that the child receives from mainstreaming may tip the balance in favor of mainstreaming, even if the child cannot flourish academically."). Therefore, this Court finds that the record supports the hearing officer's conclusion. As such, the hearing officer's decision is affirmed and this Court finds that CCISD's proposed placement of A.B. in the Learning to Learn class and removal of him from the general education class with in-class and resource room support in all core academic classes is not reasonably calculated to provide him with the requisite educational benefit in the least restrictive environment in accordance with the IDEA.

## V. CONCLUSION

Based on the foregoing analysis and discussion, CCISD's motion for summary judgment is hereby **DENIED**.

It is so **ORDERED**.

SIGNED and ENTERED this 28th day of September, 2018.

_____
Kenneth M. Hoyt
United States District Judge